# PATTERSON *v.* ILLINOIS

No. 86–7059.   Argued March 22, 1988—Decided June 24, 1988

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed a dissenting opinion, *post*, p. 300. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 301.

*Donald S. Honchell* argued the cause for petitioner. With him on the briefs were *Paul P. Biebel, Jr.,* and *Robert P. Isaacson.*

*Jack Donatelli,* Assistant Attorney General of Illinois, argued the cause for respondent. With him on the brief were *Neil F. Hartigan,* Attorney General, *Shawn W. Denney,* Solicitor General, and *Terrence M. Madsen* and *Kenneth A. Fedinets,* Assistant Attorneys General.

*Andrew J. Pincus* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief

were *Solicitor General Fried, Assistant Attorney General Weld,* and *Deputy Solicitor General Bryson.*\*

JUSTICE WHITE delivered the opinion of the Court.

In this case, we are called on to determine whether the interrogation of petitioner after his indictment violated his Sixth Amendment right to counsel.

## I

Before dawn on August 21, 1983, petitioner and other members of the "Vice Lords" street gang became involved in a fight with members of a rival gang, the "Black Mobsters." Some time after the fight, a former member of the Black Mobsters, James Jackson, went to the home where the Vice Lords had fled. A second fight broke out there, with petitioner and three other Vice Lords beating Jackson severely. The Vice Lords then put Jackson into a car, drove to the end of a nearby street, and left him face down in a puddle of water. Later that morning, police discovered Jackson, dead, where he had been left.

That afternoon, local police officers obtained warrants for the arrest of the Vice Lords, on charges of battery and mob action, in connection with the first fight. One of the gang members who was arrested gave the police a statement concerning the first fight; the statement also implicated several of the Vice Lords (including petitioner) in Jackson's murder. A few hours later, petitioner was apprehended. Petitioner was informed of his rights under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and volunteered to answer questions put to him by the police. Petitioner gave a statement concerning the initial fight between the rival gangs, but denied knowing anything

---

\*Briefs of *amici curiae* urging affirmance were filed for the Washington Legal Foundation by *Daniel J. Popeo* and *Paul D. Kamenar;* and for Americans for Effective Law Enforcement, Inc., et al. by *David Crump, Courtney A. Evans, Bernard J. Farber, Daniel B. Hales, James A. Murphy, Jack E. Yelverton, Fred E. Inbau, Wayne W. Schmidt,* and *James P. Manak.*

about Jackson's death. Petitioner was held in custody the following day, August 22, as law enforcement authorities completed their investigation of the Jackson murder.

On August 23, a Cook County grand jury indicted petitioner and two other gang members for the murder of James Jackson. Police Officer Michael Gresham, who had questioned petitioner earlier, removed him from the lockup where he was being held, and told petitioner that because he had been indicted he was being transferred to the Cook County jail. Petitioner asked Gresham which of the gang members had been charged with Jackson's murder, and upon learning that one particular Vice Lord had been omitted from the indictments, asked: "[W]hy wasn't he indicted, he did everything." App. 7. Petitioner also began to explain that there was a witness who would support his account of the crime.

At this point, Gresham interrupted petitioner, and handed him a *Miranda* waiver form. The form contained five specific warnings, as suggested by this Court's *Miranda* decision, to make petitioner aware of his right to counsel and of the consequences of any statement he might make to police.[1] Gresham read the warnings aloud, as petitioner read along with him. Petitioner initialed each of the five warnings, and signed the waiver form. Petitioner then gave a lengthy statement to police officers concerning the Jackson murder; petitioner's statement described in detail the role of each of the Vice Lords—including himself—in the murder of James Jackson.

Later that day, petitioner confessed involvement in the murder for a second time. This confession came in an inter-

---

[1] Although the signed waiver form does not appear in the record or the appendix, petitioner concedes that he was informed of his right to counsel to the extent required by our decision in *Miranda* v. *Arizona,* 384 U. S. 436 (1966). Brief for Petitioner 3; Tr. of Oral Arg. 6–8.

This apparently included informing petitioner that he had a right to remain silent; that anything he might say could be used against him; that he had a right to consult with an attorney; that he had a right to have an attorney present during interrogation; and that, as an indigent, the State would provide him with a lawyer if he so desired.

view with Assistant State's Attorney (ASA) George Smith.
At the outset of the interview, Smith reviewed with peti-
tioner the *Miranda* waiver he had previously signed, and pe-
titioner confirmed that he had signed the waiver and under-
stood his rights.   Smith went through the waiver procedure
once again: reading petitioner his rights, having petitioner
initial each one, and sign a waiver form.   In addition, Smith
informed petitioner that he was a lawyer working with the
police investigating the Jackson case.   Petitioner then gave
another inculpatory statement concerning the crime.

Before trial, petitioner moved to suppress his statements,
arguing that they were obtained in a manner at odds with
various constitutional guarantees.   The trial court denied
these motions, and the statements were used against peti-
tioner at his trial.   The jury found petitioner guilty of mur-
der, and petitioner was sentenced to a 24-year prison term.

On appeal, petitioner argued that he had not "knowingly
and intelligently" waived his Sixth Amendment right to coun-
sel before he gave his uncounseled postindictment confes-
sions.   Petitioner contended that the warnings he received,
while adequate for the purposes of protecting his *Fifth*
Amendment rights as guaranteed by *Miranda*, did not ade-
quately inform him of his *Sixth* Amendment right to counsel.
The Illinois Supreme Court, however, rejected this theory,
applying its previous decision in *People* v. *Owens*, 102 Ill. 2d
88, 464 N. E. 2d 261, cert. denied, 469 U. S. 963 (1984), which
had held that *Miranda* warnings were sufficient to make a
defendant aware of his Sixth Amendment right to counsel
during postindictment questioning.   *People* v. *Thomas*, 116
Ill. 2d 290, 298–300, 507 N. E. 2d 843, 846–847 (1987).

In reaching this conclusion, the Illinois Supreme Court
noted that this Court had reserved decision on this question
on several previous occasions[2] and that the lower courts are

---

[2] See, *e. g.*, *Michigan* v. *Jackson*, 475 U. S. 625, 635–636, n. 10 (1986);
*Moran* v. *Burbine*, 475 U. S. 412, 428, n. 2 (1986); *Brewer* v. *Williams*, 430
U. S. 387, 405–406 (1977).

divided on the issue. *Id.*, at 299, 507 N. E. 2d, at 846. We granted this petition for certiorari, 484 U. S. 895 (1987), to resolve this split of authority and to address the issues we had previously left open.

## II

There can be no doubt that petitioner had the right to have the assistance of counsel at his postindictment interviews with law enforcement authorities. Our cases make it plain that the Sixth Amendment guarantees this right to criminal defendants. *Michigan* v. *Jackson*, 475 U. S. 625, 629–630 (1986); *Brewer* v. *Williams*, 430 U. S. 387, 398–401 (1977); *Massiah* v. *United States*, 377 U. S. 201, 205–207 (1964).[3] Petitioner asserts that the questioning that produced his incriminating statements violated his Sixth Amendment right to counsel in two ways.

## A

Petitioner's first claim is that because his Sixth Amendment right to counsel arose with his indictment, the police were thereafter barred from initiating a meeting with him. See Brief for Petitioner 30–31; Tr. of Oral Arg. 2, 9, 11, 17. He equates himself with a preindictment suspect who, while being interrogated, asserts his Fifth Amendment right to counsel; under *Edwards* v. *Arizona*, 451 U. S. 477 (1981), such a suspect may not be questioned again unless he initiates the meeting.

Petitioner, however, at no time sought to exercise his right to have counsel present. The fact that petitioner's Sixth

---

[3] We note as a matter of some significance that petitioner had not retained, or accepted by appointment, a lawyer to represent him at the time he was questioned by authorities. Once an accused has a lawyer, a distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship takes effect. See *Maine* v. *Moulton*, 474 U. S. 159, 176 (1985). The State conceded as much at argument. See Tr. of Oral Arg. 28.

Indeed, the analysis changes markedly once an accused even *requests* the assistance of counsel. See *Michigan* v. *Jackson*, *supra;* Part II–A, *infra.*

Amendment right came into existence with his indictment, *i. e.*, that he had such a right at the time of his questioning, does not distinguish him from the preindictment interrogatee whose right to counsel is in existence and available for his exercise while he is questioned. Had petitioner indicated he wanted the assistance of counsel, the authorities' interview with him would have stopped, and further questioning would have been forbidden (unless petitioner called for such a meeting). This was our holding in *Michigan* v. *Jackson, supra,* which applied *Edwards* to the Sixth Amendment context. We observe that the analysis in *Jackson* is rendered wholly unnecessary if petitioner's position is correct: under petitioner's theory, the officers in *Jackson* would have been completely barred from approaching the accused in that case unless he called for them. Our decision in *Jackson,* however, turned on the fact that the accused "ha[d] asked for the help of a lawyer" in dealing with the police. *Jackson, supra,* at 631, 633–635.

At bottom, petitioner's theory cannot be squared with our rationale in *Edwards,* the case he relies on for support. *Edwards* rested on the view that once "an accused . . . ha[s] expressed his desire to deal with the police only through counsel" he should "not [be] subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication." *Edwards, supra,* at 484–485; cf. also *Michigan* v. *Mosley,* 423 U. S. 96, 104, n. 10 (1975). Preserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* and its progeny — not barring an accused from making an *initial* election as to whether he will face the State's officers during questioning with the aid of counsel, or go it alone. If an accused "knowingly and intelligently" pursues the latter course, we see no reason why the uncounseled statements he then makes must be excluded at his trial.

## B

Petitioner's principal and more substantial claim is that questioning him without counsel present violated the Sixth Amendment because he did not validly waive his right to have counsel present during the interviews. Since it is clear that after the *Miranda* warnings were given to petitioner, he not only voluntarily answered questions without claiming his right to silence or his right to have a lawyer present to advise him but also executed a written waiver of his right to counsel during questioning, the specific issue posed here is whether this waiver was a "knowing and intelligent" waiver of his Sixth Amendment right.[4] See *Brewer* v. *Williams, supra,* at 401, 404; *Johnson* v. *Zerbst,* 304 U. S. 458, 464–465 (1938).

In the past, this Court has held that a waiver of the Sixth Amendment right to counsel is valid only when it reflects "an intentional relinquishment or abandonment of a known right or privilege." *Johnson* v. *Zerbst, supra,* at 464. In other words, the accused must "kno[w] what he is doing" so that "his choice is made with eyes open." *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 279 (1942). In a case arising under the Fifth Amendment, we described this requirement as "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran* v. *Burbine,* 475 U. S. 412, 421 (1986). Whichever of these formulations is used, the key inquiry in a case such as this one must be: Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible conse-

---

[4] Of course, we also require that any such waiver must be voluntary. Petitioner contested the voluntariness of his confession in the trial court and in the intermediate appellate courts, which rejected petitioner's claim that his confessions were coerced. See 140 Ill. App. 3d 421, 425–426, 488 N. E. 2d 1283, 1287 (1986).

Petitioner does not appear to have maintained this contention before the Illinois Supreme Court, and in any event, he does not press this argument here. Thus, the "voluntariness" of petitioner's confessions is not before us.

quences of a decision to forgo the aid of counsel? In this case, we are convinced that by admonishing petitioner with the *Miranda* warnings, respondent has met this burden and that petitioner's waiver of his right to counsel at the questioning was valid.[5]

First, the *Miranda* warnings given petitioner made him aware of his right to have counsel present during the questioning. By telling petitioner that he had a right to consult with an attorney, to have a lawyer present while he was questioned, and even to have a lawyer appointed for him if he could not afford to retain one on his own, Officer Gresham and ASA Smith conveyed to petitioner the sum and substance of the rights that the Sixth Amendment provided him. "Indeed, it seems self-evident that one who is told he" has such rights to counsel "is in a curious posture to later complain" that his waiver of these rights was unknowing. Cf. *United States* v. *Washington*, 431 U. S. 181, 188 (1977). There is little more petitioner could have possibly been told in an effort to satisfy this portion of the waiver inquiry.

Second, the *Miranda* warnings also served to make petitioner aware of the consequences of a decision by him to waive his Sixth Amendment rights during postindictment questioning. Petitioner knew that any statement that he made could be used against him in subsequent criminal proceedings. This is the ultimate adverse consequence petitioner could have suffered by virtue of his choice to make

---

[5] We emphasize the significance of the fact that petitioner's waiver of counsel was only for this limited aspect of the criminal proceedings against him—only for postindictment questioning. Our decision on the validity of petitioner's waiver extends only so far.

Moreover, even within this limited context, we note that petitioner's waiver was binding on him *only* so long as he wished it to be. Under this Court's precedents, at any time during the questioning petitioner could have changed his mind, elected to have the assistance of counsel, and immediately dissolve the effectiveness of his waiver with respect to any subsequent statements. See, *e. g.*, *Michigan* v. *Jackson*, 475 U. S., at 631–635; Part II–A, *supra*. Our decision today does nothing to change this rule.

uncounseled admissions to the authorities. This warning also sufficed—contrary to petitioner's claim here, see Tr. of Oral Arg. 7–8—to let petitioner know what a lawyer could "do for him" during the postindictment questioning: namely, advise petitioner to refrain from making any such statements.[6] By knowing what could be done with any statements he might make, and therefore, what benefit could be obtained by having the aid of counsel while making such statements, petitioner was essentially informed of the possible consequences of going without counsel during questioning. If petitioner nonetheless lacked "a full and complete appreciation of all of the consequences flowing" from his waiver, it does not defeat the State's showing that the information it provided to him satisfied the constitutional minimum. Cf. *Oregon* v. *Elstad,* 470 U. S. 298, 316–317 (1985).

Our conclusion is supported by petitioner's inability, in the proceedings before this Court, to articulate with precision what additional information should have been provided to him before he would have been competent to waive his right to counsel. All that petitioner's brief and reply brief suggest is petitioner should have been made aware of his "right under the Sixth Amendment to the broad protection of counsel"—a rather nebulous suggestion—and the "gravity of [his] situation." Reply Brief for Petitioner 13; see Brief for Petitioner 30–31. But surely this latter "requirement" (if it is one) was met when Officer Gresham informed petitioner that he had been formally charged with the murder of James Jackson.

---

[6] An important basis for our analysis is our understanding that an attorney's role at postindictment questioning is rather limited, and substantially different from the attorney's role in later phases of criminal proceedings. At trial, an accused needs an attorney to perform several varied functions—some of which are entirely beyond even the most intelligent layman. Yet during postindictment questioning, a lawyer's role is rather unidimensional: largely limited to advising his client as to what questions to answer and which ones to decline to answer.

We discuss this point in greater detail below. See Part II–C, *infra.*

See n. 8, *infra*. Under close questioning on this same point at argument, petitioner likewise failed to suggest any meaningful additional information that he should have been, but was not, provided in advance of his decision to waive his right to counsel.[7] The discussions found in favorable court decisions, on which petitioner relies, are similarly lacking.[8]

---

[7] Representative excerpts from the relevant portions of argument include the following:

"QUESTION: [Petitioner] . . . was told that he had a right to counsel.

"MR. HONCHELL [petitioner's counsel]: He was told—the word 'counsel' was used. He was told he had a right to counsel. But not through information by which it would become meaningful to him, because the method that was used was not designed to alert the accused to the Sixth Amendment rights to counsel. . . .

"QUESTION: . . . You mean they should have said you have a Sixth Amendment right to counsel instead of just, you have a right to counsel?

"He knew he had a right to have counsel present before [he] made the confession. Now, what in addition did he have to know to make the waiver an intelligent one?

"MR. HONCHELL: He had to meaningfully know he had a Sixth Amendment right to counsel present because—

"QUESTION: What is the difference between meaningfully knowing and knowing?

"MR. HONCHELL: Because the warning here used did not convey or express what counsel was intended to do for him after indictment.

"QUESTION: So then you say . . . [that] he would have had to be told more about what counsel would do for him after indictment before he could intelligently waive?

"MR. HONCHELL: That there is a right to counsel who would act on his behalf and represent him.

"QUESTION: Well, okay. So it should have said, in addition to saying counsel, counsel who would act on your behalf and represent you? That would have been the magic solution?

"MR. HONCHELL: That is a possible method, yes." Tr. of Oral Arg. 7–8.

We do not believe that adding the words "who would act on your behalf and represent you" in Sixth Amendment cases would provide any meaningful improvement in the *Miranda* warnings. Cf. *Brewer* v. *Williams*, 430 U. S., at 435–436, n. 5 (WHITE, J., dissenting).

[8] Even those lower court cases which have suggested that something beyond *Miranda* warnings is—or may be—required before a Sixth Amend-

As a general matter, then, an accused who is admonished with the warnings prescribed by this Court in *Miranda*, 384 U. S., at 479, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.[9] We feel that

ment waiver can be considered "knowing and intelligent" have failed to suggest just what this "something more" should be. See, *e. g.*, *Felder* v. *McCotter*, 765 F. 2d 1245, 1250 (CA5 1985); *Robinson* v. *Percy*, 738 F. 2d 214, 222 (CA7 1984); *Fields* v. *Wyrick*, 706 F. 2d 879, 880–881 (CA8 1983).

An exception to this is the occasional suggestion that, in addition to the *Miranda* warnings, an accused should be informed that he has been indicted before a postindictment waiver is sought. See, *e. g.*, *United States* v. *Mohabir*, 624 F. 2d 1140, 1150 (CA2 1980); *United States* v. *Payton*, 615 F. 2d 922, 924–925 (CA1), cert. denied, 446 U. S. 969 (1980). Because, in this case, petitioner concedes that he was so informed, see Brief for Petitioner 3, we do not address the question whether or not an accused must be told that he has been indicted before a postindictment Sixth Amendment waiver will be valid. Nor do we even pass on the desirability of so informing the accused—a matter that can be reasonably debated. See, *e. g.*, Tr. of Oral Arg. 24.

Beyond this, only one Court of Appeals—the Second Circuit—has adopted substantive or procedural requirements (in addition to *Miranda*) that must be completed before a Sixth Amendment waiver can be effectuated for postindictment questioning. See *United States* v. *Mohabir*, 624 F. 2d, at 1150–1153. As have a majority of the Courts of Appeals, we reject *Mohabir*'s holding that some "additional" warnings or discussions with an accused are required in this situation, or that any waiver in this context can only properly be made before a "neutral . . . judicial officer." *Ibid.*

[9] This does not mean, of course, that all Sixth Amendment challenges to the conduct of postindictment questioning will fail whenever the challenged practice would pass constitutional muster under *Miranda*. For example, we have permitted a *Miranda* waiver to stand where a suspect was not told that his lawyer was trying to reach him during questioning; in the Sixth Amendment context, this waiver would not be valid. See *Moran* v. *Burbine*, 475 U. S., at 424, 428. Likewise a surreptitious conversation between an undercover police officer and an unindicted suspect would not give rise to any *Miranda* violation as long as the "interrogation" was not in a custodial setting, see *Miranda*, 384 U. S., at 475; however, once the

our conclusion in a recent Fifth Amendment case is equally apposite here: "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." See *Moran* v. *Burbine*, 475 U. S., at 422–423.

## C

We consequently reject petitioner's argument, which has some acceptance from courts and commentators,[10] that since "the sixth amendment right [to counsel] is far superior to that of the fifth amendment right" and since "[t]he greater the right the greater the loss from a waiver of that right," waiver of an accused's Sixth Amendment right to counsel should be "more difficult" to effectuate than waiver of a suspect's Fifth Amendment rights. Brief for Petitioner 23. While our cases have recognized a "difference" between the Fifth Amendment and Sixth Amendment rights to counsel, and the "policies" behind these constitutional guarantees,[11] we have never suggested that one right is "superior" or "greater" than the other, nor is there any support in our cases for the notion that be-

---

accused is indicted, such questioning would be prohibited. See *United States* v. *Henry*, 447 U. S. 264, 273, 274–275 (1980).

Thus, because the Sixth Amendment's protection of the attorney-client relationship—"the right to rely on counsel as a 'medium' between [the accused] and the State"—extends beyond *Miranda*'s protection of the Fifth Amendment right to counsel, see *Maine* v. *Moulton*, 474 U. S., at 176, there will be cases where a waiver which would be valid under *Miranda* will not suffice for Sixth Amendment purposes. See also *Michigan* v. *Jackson*, 475 U. S., at 632.

[10] See, *e. g.*, *United States* v. *Mohabir*, *supra*, at 1149–1152; Note, Proposed Requirements for Waiver of the Sixth Amendment Right to Counsel, 82 Colum. L. Rev. 363, 372 (1982).

[11] See, *e. g.*, *Michigan* v. *Jackson*, *supra*, at 633, n. 7; *Rhode Island* v. *Innis*, 446 U. S. 291, 300, n. 4 (1980).

cause a Sixth Amendment right may be involved, it is more difficult to waive than the Fifth Amendment counterpart.

Instead, we have taken a more pragmatic approach to the waiver question—asking what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage—to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that should be required before a waiver of that right will be recognized.

At one end of the spectrum, we have concluded there is no Sixth Amendment right to counsel whatsoever at a postindictment photographic display identification, because this procedure is not one at which the accused "require[s] aid in coping with legal problems or assistance in meeting his adversary." See *United States* v. *Ash,* 413 U. S. 300, 313–320 (1973). At the other extreme, recognizing the enormous importance and role that an attorney plays at a criminal trial, we have imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial. See *Faretta* v. *California,* 422 U. S. 806, 835–836 (1975); cf. *Von Moltke* v. *Gillies,* 332 U. S. 708, 723–724 (1948). In these extreme cases, and in others that fall between these two poles, we have defined the scope of the right to counsel by a pragmatic assessment of the usefulness of counsel to the accused at the particular proceeding, and the dangers to the accused of proceeding without counsel. An accused's waiver of his right to counsel is "knowing" when he is made aware of these basic facts.

Applying this approach, it is our view that whatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of postindictment questioning. The State's decision to take an additional step and commence formal adversarial proceedings against the accused does not substantially increase the value of counsel to the accused at questioning, or expand the limited purpose that an attorney serves when the

accused is questioned by authorities. With respect to this inquiry, we do not discern a substantial difference between the usefulness of a lawyer to a suspect during custodial interrogation, and his value to an accused at postindictment questioning.[12]

Thus, we require a more searching or formal inquiry before permitting an accused to waive his right to counsel at trial than we require for a Sixth Amendment waiver during postindictment questioning—*not* because postindictment questioning is "less important" than a trial (the analysis that petitioner's "hierarchical" approach would suggest)—but because the full "dangers and disadvantages of self-representation," *Faretta, supra,* at 835, during questioning are less substantial and more obvious to an accused than they are at trial.[13] Because the role of counsel at questioning is relatively simple and limited, we see no problem in having a waiver procedure at that stage which is likewise simple and limited. So long as the accused is made aware of the "dangers and disadvantages

---

[12] We note, incidentally, that in the *Miranda* decision itself, the analysis and disposition of the waiver question relied on this Court's decision in *Johnson* v. *Zerbst,* 304 U. S. 458 (1938)—a *Sixth* Amendment waiver case. See *Miranda,* 384 U. S., at 475.

From the outset, then, this Court has recognized that the waiver inquiry focuses more on the lawyer's role during such questioning, rather than the particular constitutional guarantee that gives rise to the right to counsel at that proceeding. See *ibid.;* see also *Moran* v. *Burbine,* 475 U. S., at 421. Thus, it should be no surprise that we now find a strong similarity between the level of knowledge a defendant must have to waive his Fifth Amendment right to counsel, and the protection accorded to Sixth Amendment rights. See Comment, Constitutional Law—Right to Counsel, 49 Geo. Wash. L. Rev. 399, 409 (1981).

[13] As discussed above, see n. 6, *supra,* an attorney's role at questioning is relatively limited. But at trial, counsel is required to help even the most gifted layman adhere to the rules of procedure and evidence, comprehend the subtleties of *voir dire,* examine and cross-examine witnesses effectively (including the accused), object to improper prosecution questions, and much more. Cf., *e. g.,* 1 Bench Book for United States District Court Judges 1.02–2—1.02–5 (3d ed. 1986); *McDowell* v. *United States,* 484 U. S. 980 (1987) (WHITE, J., dissenting from denial of certiorari).

of self-representation" during postindictment questioning, by use of the *Miranda* warnings, his waiver of his Sixth Amendment right to counsel at such questioning is "knowing and intelligent."

## III

Before confessing to the murder of James Jackson, petitioner was meticulously informed by authorities of his right to counsel, and of the consequences of any choice not to exercise that right. On two separate occasions, petitioner elected to forgo the assistance of counsel, and speak directly to officials concerning his role in the murder. Because we believe that petitioner's waiver of his Sixth Amendment rights was "knowing and intelligent," we find no error in the decision of the trial court to permit petitioner's confessions to be used against him. Consequently, the judgment of the Illinois Supreme Court is

*Affirmed.*

JUSTICE BLACKMUN, dissenting.

I agree with most of what JUSTICE STEVENS says in his dissenting opinion, *post,* p. 301. I, however, merely would hold that after formal adversary proceedings against a defendant have been commenced, the Sixth Amendment mandates that the defendant not be "'subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Michigan* v. *Jackson,* 475 U. S. 625, 626 (1986), quoting *Edwards* v. *Arizona,* 451 U. S. 477, 484–485 (1981).

The Court's majority concludes, *ante,* at 290–291: "The fact that petitioner's Sixth Amendment right came into existence with his indictment . . . does not distinguish him from the preindictment interrogatee whose right to counsel is in existence and available for his exercise while he is questioned." I must disagree. "[W]hen the Constitution grants protection against criminal proceedings without the assistance of coun-

sel, counsel must be furnished whether or not the accused requested the appointment of counsel." *Carnley* v. *Cochran*, 369 U. S. 506, 513 (1962) (internal quotations omitted). In my view, the Sixth Amendment does not allow the prosecution to take undue advantage of any gap between the commencement of the adversary process and the time at which counsel is appointed for a defendant.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The Court should not condone unethical forms of trial preparation by prosecutors or their investigators. In civil litigation it is improper for a lawyer to communicate with his or her adversary's client without either notice to opposing counsel or the permission of the court.[1] An attempt to obtain evidence for use at trial by going behind the back of one's adversary would be not only a serious breach of professional ethics but also a manifestly unfair form of trial practice. In the criminal context, the same ethical rules apply and, in my opinion, notions of fairness that are at least as demanding should also be enforced.

After a jury has been empaneled and a criminal trial is in progress, it would obviously be improper for the prosecutor to conduct a private interview with the defendant for the pur-

---

[1] Disciplinary Rule 7–104 of the ABA Model Code of Professional Responsibility (1982) provides in relevant part:

"(A) During the course of his representation of a client a lawyer shall not:

"(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so."

Likewise, Rule 4.2 of the ABA Model Rules of Professional Conduct (1984) provides:

"In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

pose of obtaining evidence to be used against him at trial. By "private interview" I mean, of course, an interview initiated by the prosecutor, or his or her agents, without notice to the defendant's lawyer and without the permission of the court. Even if such an interview were to be commenced by giving the defendant the five items of legal advice that are mandated by *Miranda*, see *ante*, at 288, n. 1, I have no doubt that this Court would promptly and unanimously condemn such a shabby practice. As our holding in *Michigan* v. *Jackson*, 475 U. S. 625 (1986), suggests, such a practice would not simply constitute a serious ethical violation, but would rise to the level of an impairment of the Sixth Amendment right to counsel.[2]

---

[2] In *Jackson*, we held that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U. S., at 636. In that case we held the waiver invalid even though the appointed law firm had not yet received notice of the appointment and the defendant had not yet been informed that a law firm had been appointed to represent him. *Id.*, at 627.

Similarly, our holdings in *Massiah* v. *United States*, 377 U. S. 201 (1964), *United States* v. *Henry*, 447 U. S. 264 (1980), and *Maine* v. *Moulton*, 474 U. S. 159 (1985), suggest that law enforcement personnel may not bypass counsel in favor of direct communications with an accused. In each of these cases, the government engaged in secret attempts to elicit incriminating statements from an indicted suspect through the use of government informants. Yet, the Court's analysis does not turn primarily upon the covert nature of the interrogation. See *Brewer* v. *Williams*, 430 U. S. 387, 400 (1977) ("That the incriminating statements were elicited surreptitiously in the *Massiah* case, and otherwise here, is constitutionally irrelevant"). Nor does the finding of a Sixth Amendment violation appear to turn upon the absence of a waiver, which, of course, could not have been obtained given the surreptitious nature of the attempts to elicit incriminating statements. But cf. *Jackson*, 475 U. S., at 641, n. 4 (REHNQUIST, J., dissenting). As the Court wrote in *Moulton:*

"Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to

The question that this case raises, therefore, is at what point in the adversary process does it become impermissible for the prosecutor, or his or her agents, to conduct such private interviews with the opposing party? Several alternatives are conceivable: when the trial commences, when the defendant has actually met and accepted representation by his or her appointed counsel, when counsel is appointed, or when the adversary process commences. In my opinion, the Sixth Amendment right to counsel demands that a firm and unequivocal line be drawn at the point at which adversary proceedings commence.

In prior cases this Court has used strong language to emphasize the significance of the formal commencement of adversary proceedings. Such language has been employed to explain decisions denying the defendant the benefit of the protection of the Sixth Amendment in preindictment settings, but an evenhanded interpretation of the Amendment would support the view that additional protection should automatically attach the moment the formal proceed-

respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel." 474 U. S., at 170–171 (footnote omitted).

See also *Henry*, 447 U. S., at 274 ("By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel") (footnote omitted); *Massiah*, 377 U. S., at 206 ("We hold that the petitioner was denied the basic protections of [the Sixth Amendment] guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel"). I think it clear that an *ex parte* communication between a prosecutor, or his or her agents, and a represented defendant—regardless of whether the accused has received *Miranda* warnings—can only be viewed as an attempt to "circumven[t]" and "dilut[e] the protection afforded by the right to counsel." *Moulton*, 474 U. S., at 171.

ings begin. One such example is *Kirby* v. *Illinois*, 406 U. S. 682 (1972), in which the Court concluded that the general rule requiring the presence of counsel at pretrial, lineup identifications, see *United States* v. *Wade*, 388 U. S. 218 (1967); *Gilbert* v. *California*, 388 U. S. 263 (1967), should not extend to protect custodial defendants not yet formally charged. Justice Stewart's plurality opinion explained the significance of the formal charge:

> "The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable. See *Powell* v. *Alabama*, 287 U. S., at 66–71; *Massiah* v. *United States*, 377 U. S. 201; *Spano* v. *New York*, 360 U. S. 315, 324 (Douglas, J., concurring)." 406 U. S., at 689–690 (footnote omitted).

Similarly, in *United States* v. *Gouveia*, 467 U. S. 180 (1984), we relied upon the significance of the absence of a formal charge in concluding that the Sixth Amendment does not require the appointment of counsel for indigent prison inmates confined in administrative detention while authorities investigate their possible involvement in criminal activity. Again the Court noted that "given the plain language of the Amendment and its purpose of protecting the unaided layman at critical confrontations with his adversary, our conclusion that the right to counsel attaches at the initiation of adversary ju-

dicial criminal proceedings 'is far from a mere formalism.' *Kirby* v. *Illinois*, 406 U. S., at 689." *Id.*, at 189.

Most recently, in *Moran* v. *Burbine*, 475 U. S. 412 (1986), the Court upheld a waiver of the right to counsel in a pretrial context even though the waiver "would not be valid" if the same situation had arisen after indictment, see *ante*, at 296–297, n. 9. In the *Moran* opinion, the Court explained:

> "It is clear, of course, that, absent a valid waiver, the defendant has the right to the presence of an attorney during any interrogation occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches. *United States* v. *Gouveia*, 467 U. S. 180, 187 (1984); *Kirby* v. *Illinois*, 406 U. S. 682, 689 (1972) (opinion of Stewart, J.). See *Brewer* v. *Williams*, 430 U. S., at 400–401. And we readily agree that once the right *has* attached, it follows that the police may not interfere with the efforts of a defendant's attorney to act as a '"medium" between [the suspect] and the State' during the interrogation. *Maine* v. *Moulton*, 474 U. S. 159, 176 (1985); see *Brewer* v. *Williams*, *supra*, at 401, n. 8. The difficulty for respondent is that the interrogation sessions that yielded the inculpatory statements took place *before* the initiation of 'adversary judicial proceedings.' *United States* v. *Gouveia*, *supra*, at 192." 475 U. S., at 428.

Today, however, in reaching a decision similarly favorable to the interest in law enforcement unfettered by process concerns, the Court backs away from the significance previously attributed to the initiation of formal proceedings. In the majority's view, the purported waiver of counsel in this case is properly equated with that of an unindicted suspect. Yet, as recognized in *Kirby*, *Gouveia*, and *Moran*, important differ-

ences separate the two.[3]   The return of an indictment, or like instrument, substantially alters the relationship between the state and the accused.   Only after a formal accusation has "the government . . . committed itself to prosecute, and only then [have] the adverse positions of government and defendant . . . solidified."   *Kirby*, 406 U. S., at 689.   Moreover, the return of an indictment also presumably signals the government's conclusion that it has sufficient evidence to establish a prima facie case.   As a result, any further interrogation can only be designed to buttress the government's case; authorities are no longer simply attempting "'to solve a crime.'"   *United States* v. *Mohabir*, 624 F. 2d 1140, 1148 (CA2 1980) (quoting *People* v. *Waterman*, 9 N. Y. 2d 561, 565, 175 N. E. 2d 445, 447 (1961)); see also *Moran* v. *Burbine*, 475 U. S., at 430.   Given the significance of the initiation of formal proceedings and the concomitant shift in the relationship between the state and the accused, I think it quite wrong to suggest that *Miranda* warnings — or for that

---

[3] Other of our prior decisions have also made clear that the return of a formal charge fundamentally alters the relationship between the State and the accused, conferring increased protections upon defendants in their interactions with state authorities.   In *Michigan* v. *Jackson*, 475 U. S. 625 (1986), we explained:

"Indeed, after a formal accusation has been made — and a person who had previously been just a 'suspect' has become an 'accused' within the meaning of the Sixth Amendment — the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation.   Thus, the surreptitious employment of a cellmate, see *United States* v. *Henry*, 447 U. S. 264 (1980), or the electronic surveillance of conversations with third parties, see *Maine* v. *Moulton*, [474 U. S. 159 (1985)]; *Massiah* v. *United States*, 377 U. S. 201 (1964), may violate the defendant's Sixth Amendment right to counsel even though the same methods of investigation might have been permissible before arraignment or indictment."   *Id.*, at 632 (footnote omitted).

See also *Wyrick* v. *Fields*, 459 U. S. 42, 50 (1982) (MARSHALL, J., dissenting).

matter, any warnings offered by an adverse party—provide a sufficient basis for permitting the undoubtedly prejudicial—and, in my view, unfair—practice of permitting trained law enforcement personnel and prosecuting attorneys to communicate with as-of-yet unrepresented criminal defendants.

It is well settled that there is a strong presumption against waiver of Sixth Amendment protections, see *Michigan* v. *Jackson*, 475 U. S., at 633; *Von Moltke* v. *Gillies*, 332 U. S. 708, 723 (1948) (plurality opinion); *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938), and that a waiver may only be accepted if made with full awareness of "the dangers and disadvantages of self-representation," *Faretta* v. *California*, 422 U. S. 806, 835 (1975); see also *Adams* v. *United States ex rel. McCann*, 317 U. S. 269, 279 (1942) (accused "may waive his Constitutional right to assistance of counsel if he knows what he is doing and his choice is made with eyes open"). Warnings offered by an opposing party, whether detailed or cursory, simply cannot satisfy this high standard.

The majority premises its conclusion that *Miranda* warnings lay a sufficient basis for accepting a waiver of the right to counsel on the assumption that those warnings make clear to an accused "what a lawyer could 'do for him' during the postindictment questioning: namely, advise [him] to refrain from making any [incriminating] statements." *Ante*, at 294 (footnote omitted).[4] Yet, this is surely a gross understatement of the disadvantage of proceeding without a lawyer and

---

[4] The majority finds support for its conclusion that *Miranda* warnings provide a sufficient basis for a waiver of the Sixth Amendment right to counsel in "petitioner's inability, in the proceedings before this Court, to articulate with precision what additional information should have been provided to him before he would have been competent to waive his right to counsel." *Ante*, at 294. Additional—although not exhaustive—possible warnings, however, have been articulated. See, *e. g.*, *United States* v. *Callabrass*, 458 F. Supp. 964, 967 (SDNY 1978). Part of the difficulty in fashioning a proper boilerplate set of warnings is that, unlike in the Fifth Amendment context, the information that must be imparted to the accused will vary from case to case as the facts, legal issues, and parties differ.

an understatement of what a defendant must understand to make a knowing waiver.[5] The *Miranda* warnings do not, for example, inform the accused that a lawyer might examine the indictment for legal sufficiency before submitting his or her client to interrogation or that a lawyer is likely to be considerably more skillful at negotiating a plea bargain and that such negotiations may be most fruitful if initiated prior to any interrogation. Rather, the warnings do not even go so far as to explain to the accused the nature of the charges pending against him—advice that a court would insist upon before allowing a defendant to enter a guilty plea with or without the presence of an attorney, see *Henderson* v. *Morgan,* 426 U. S. 637 (1976). Without defining precisely the nature of the inquiry required to establish a valid waiver of the Sixth Amendment right to counsel, it must be conceded that at least minimal advice is necessary—the accused must be told of the "dangers and disadvantages of self-representation."

Yet, once it is conceded that certain advice is required and that after indictment the adversary relationship between the state and the accused has solidified, it inescapably follows

---

[5] Respondent, and the United States as *amicus curiae,* argue that the comprehensive inquiry required by *Faretta* v. *California,* 422 U. S. 806 (1975), should not be extended to pretrial waivers because the role of counsel—and conversely the difficulty of proceeding without counsel—is more important at trial. I reject the premise that a lawyer's skills are more likely to sit idle at a pretrial interrogation than at trial. Both events require considerable experience and expertise and I would be reluctant to rank one over the other. Moreover, as we recognized in *Escobedo* v. *Illinois,* 378 U. S. 478 (1964):

"[T]he 'right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination.' *In re Groban,* 352 U. S. 330, 344 (Black, J., · dissenting). 'One can imagine a cynical prosecutor saying: "Let them have the most illustrious counsel, now. They can't escape the noose. There is nothing that counsel can do for them at the trial."' *Ex parte Sullivan,* 107 F. Supp. 514, 517–518." *Id.,* at 487–488 (footnote omitted).

See also *United States* v. *Wade,* 388 U. S. 218, 226 (1967); *Spano* v. *New York,* 360 U. S. 315, 325, 326 (1959) (Douglas, J., concurring).

that a prosecutor may not conduct private interviews with a charged defendant. As at least one Court of Appeals has recognized, there are ethical constraints that prevent a prosecutor from giving legal advice to an uncounseled adversary.[6] Thus, neither the prosecutor nor his or her agents can ethically provide the unrepresented defendant with the kind of advice that should precede an evidence-gathering interview after formal proceedings have been commenced. Indeed, in my opinion even the *Miranda* warnings themselves are a species of legal advice that is improper when given by the prosecutor after indictment.

Moreover, there are good reasons why such advice is deemed unethical, reasons that extend to the custodial, post-indictment setting with unequaled strength. First, the offering of legal advice may lead an accused to underestimate the prosecuting authorities' true adversary posture. For an incarcerated defendant — in this case, a 17-year-old who had been in custody for 44 hours at the time he was told of the

---

[6] In discussing a suggestion that the prosecutor should supplement the customary *Miranda* warnings in the postindictment setting, the Court of Appeals for the Second Circuit wrote:

"We believe there are strong policy reasons, grounded in ethical considerations, for not adopting the . . . alternative of having the prosecutor give further warnings to the defendant. The government itself points out that a prosecutor 'is, in many senses, an adversary of the defendant, and, as such, is counselled not to give him legal advice'; in support of this proposition, the government cites the ABA Code of Professional Responsibility, DR 7–104(A)(2).[14]

"[14] DR 7–104(A) provides:

"During the course of his representation of a client a lawyer shall not:

"(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

"(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client." *United States* v. *Mohabir*, 624 F. 2d 1140, 1152 (1980).

indictment—the assistance of someone to explain why he is being held, the nature of the charges against him, and the extent of his legal rights, may be of such importance as to overcome what is perhaps obvious to most, that the prosecutor is a foe and not a friend. Second, the adversary posture of the parties, which is not fully solidified until formal charges are brought, will inevitably tend to color the advice offered. As hard as a prosecutor might try, I doubt that it is possible for one to wear the hat of an effective adviser to a criminal defendant while at the same time wearing the hat of a law enforcement authority. Finally, regardless of whether or not the accused actually understands the legal and factual issues involved and the state's role as an adversary party, advice offered by a lawyer (or his or her agents) with such an evident conflict of interest cannot help but create a public perception of unfairness and unethical conduct. And as we held earlier this Term, "courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat* v. *United States*, 486 U. S. 153, 160 (1988). This interest is a factor that may be considered in deciding whether to override a defendant's waiver of his or her Sixth Amendment right to conflict-free representation, see *ibid.*, and likewise, should be considered in determining whether a waiver based on advice offered by the criminal defendant's adversary is ever appropriate.[7]

In sum, without a careful discussion of the pitfalls of proceeding without counsel, the Sixth Amendment right cannot properly be waived. An adversary party, moreover, cannot adequately provide such advice. As a result, once the right to counsel attaches and the adversary relationship between

---

[7] In *Wheat*, we sustained the District Court's decision to reject the defendant's waiver of the right to conflict-free representation even though Wheat, unlike the petitioner, made his decision to waive this right with the assistance of additional counsel, see 486 U. S., at 172 (STEVENS, J., dissenting).

the state and the accused solidifies, a prosecutor cannot conduct a private interview with an accused party without "dilut[ing] the protection afforded by the right to counsel," *Maine* v. *Moulton*, 474 U. S. 159, 171 (1985). Although this ground alone is reason enough to never permit such private interviews, the rule also presents the added virtue of drawing a clear and easily identifiable line at the point between the investigatory and adversary stages of a criminal proceeding. Such clarity in definition of constitutional rules that govern criminal proceedings is important to the law enforcement profession as well as to the private citizen. See *Arizona* v. *Roberson*, 486 U. S. 675 (1988). It is true, of course, that the interest in effective law enforcement would benefit from an opportunity to engage in incommunicado questioning of defendants who, for reasons beyond their control, have not been able to receive the legal advice from counsel to which they are constitutionally entitled. But the Court's singleminded concentration on that interest might also lead to the toleration of similar practices at any stage of the trial. I think it clear that such private communications are intolerable not simply during trial, but at any point after adversary proceedings have commenced.

I therefore respectfully dissent.